UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                  :

DERMONT THOMAS,            :

                             :    **MEMORANDUM**

                 Plaintiff,      :    **DECISION AND ORDER**

                                    :

         - against -           :    15 Civ. 3236 (BMC)

                                    :

GINA DIGGLIO; CATHY CHIOU;       :

CHARMAINE CORT; V. GRANT; JOHN   :

DOE P.O. and JOHN DOE, P.O.,      :

                                    :

                  Defendants.     :

---------------------------------------------------------- X

**COGAN, District Judge.**

     Plaintiff *pro se* is the father of six children,[1] who were removed from their home at various times by the New York City Administration for Children's Services ("ACS") after a school guidance counselor filed a complaint that two of the children frequently came to school late, hungry, and with poor hygiene. Plaintiff has sued the guidance counselor, the ACS caseworkers involved in the removal – one who received the report and two who visited the home and effected the removal – and the two police officers who assisted in the removal. Plaintiff brings claims under 42 U.S.C. § 1983, asserting that these individuals violated his rights under the Fourth and Fourteenth Amendments of the Constitution. Defendants moved for judgment on the pleadings; I converted the motion to summary judgment and received additional evidence and submissions from the parties. As shown below, plaintiff's rights were not violated, and defendants' motion must therefore be granted.

---

[1] The six children will be referred to by their initials as follows: J.B., K.B., D.B., A.B., baby Z.B., and infant J.B.

# BACKGROUND

The case originated from a report to ACS sent by a guidance counselor at the school of two of the children, who plaintiff has identified as defendant "Gina Digglio."[2] The report stated as follows:

> 7 yr old . . . [J.B.] has been late for school 25 times & absent 4. Mother is aware, but fails to correct the problem. The child's education is negatively impacted as a result of her poor attendance. . . . There are 2 children in the home, [J.B.] and [A.B.]. Both children have the same attendance issues & they frequently come to school late & hungry. In addition, both children have been noticed with poor hygiene. . . . [J.B.] is a Special Education student & she is not completing her homework. The family live [sic] a cross [sic] the street from the school.

The report was received by ACS caseworker defendant Cathy Chiou. She, in turn, dispatched defendant caseworkers Charmaine Cort and V. Grant (the "caseworkers") to visit the residence on Bushwick Avenue (the "Apartment"). The visit occurred on Friday night, November 12, 2010, and the caseworkers determined to remove the children. The children were removed with the assistance of two John Doe police officers.[3]

There were a number of subsequent proceedings in Family Court following the removal of the children. Defendants have submitted records from these proceedings that disclose a number of material facts that cannot be genuinely disputed and are sufficient to resolve this motion. First, on the night the children were removed, the children's mother,[4] who was present

---

[2] I previously ordered that defendants may continue to refer to the guidance counselor as "Gina Digglio," which is not her correct name, pursuant to N.Y. Soc. Serv. L. § 422(4)(A). That statute provides for confidentiality as to the identity of an individual who makes a report of child abuse to the State Central Registry.

[3] Defendants have provided plaintiff with the identities and service addresses of the two John Doe police officers, but plaintiff has not sought to change the caption to reflect their names, and in light of the disposition in this decision, I see no reason to do it now.

[4] The children's mother's, the oldest child's, and the infant's initials are all J.B. I will refer to the children's mother as "the mother," the oldest child as "J.B.," and the infant as "infant J.B."

for the visit, gave ACS signed consent to remove the children.  The consent form was entitled,

"NOTICE OF TEMPORARY REMOVAL OF CHILD(REN) AND RIGHT TO HEARING."

The form stated, "I understand the term and conditions of this temporary removal, and I agree to

the removal of my child(ren) as stated."  Above her signature, it stated, "NOTICE: YOU DO

NOT HAVE TO CONSENT TO THIS REMOVAL."  The form further advised her that a

hearing would be held before the Family Court the following Tuesday, November 16, 2010, for

intake.  In addition, the mother signed a medical release form pursuant to the Health Insurance

Portability and Accountability Act ("HIPAA"), enabling ACS to obtain baby Z.B.'s medical

records.

On November 16, 2010, Family Court Judge Lim held a hearing pursuant to § 1027 of the

New York Family Court Act, which calls for a preliminary hearing when ACS caseworkers

remove children without court authorization to determine whether the children should remain in

ACS custody or be returned to the parents.  The mother was present and represented by counsel

at the hearing.  Plaintiff did not attend.[5]

At the hearing, Judge Lim ordered remand of the children to the custody of ACS.  The

mother then requested a hearing pursuant to § 1028 of the Family Court Act, which allows for a

parent or guardian to petition for the return of children that the Family Court has previously

ordered removed.  The mother informed the Court that she believed that plaintiff was the father

of the youngest child, baby Z.B, but that she did not know the father or fathers of the other

children.  Judge Lim set a date for the § 1028 hearing to be held before Family Court Judge

Weinstein and directed ACS to serve plaintiff with notice.

---

[5]  During the hearing, the attorney for ACS stated that ACS was unaware of the father or fathers of the children.
ACS's petition also states that the father was unknown, but named plaintiff as a respondent.  The petition explained
that plaintiff, the mother's "paramour", assists "in the care and supervision" of the children and thus was also a
"person legally responsible" for the neglect of the children.

After the November 16, 2010 hearing, Judge Lim entered a written order reflecting his ruling from the bench.  Judge Lim's order directed remand of the children to the custody of ACS, finding that the standard to sustain removal, "imminent risk" to the children, had been met. Judge Lim determined that there was imminent risk because, according to his Order, there were "deplorable conditions in the house, little food, child [J.B.] is not going to school, child [Z.B.] is diagnosed as failing to thrive."   He also found that "respondent" – both plaintiff and the mother were named as respondents, although it appears he was only referring to the mother – was present at the hearing.

The most significant Family Court proceeding, for our purposes at least, is the § 1028 hearing, which began a couple of weeks later, on November 30, 2010, before Family Court Judge Weinstein.  At that hearing, the mother sought the return of the four oldest children, not baby Z.B., who was then about three months old.  It is significant for a number of reasons.

First, plaintiff was represented by an attorney at the proceeding, and he and his attorney took positions that are inconsistent with several positions that plaintiff is taking in this § 1983 action.  Plaintiff was not only present, but was placed under oath.  Plaintiff's attorney asserted before Judge Weinstein that plaintiff had no interest in the proceeding because he was not the father of the four oldest children – he was only the father of baby Z.B.:  "Your Honor, just to clarify, so I believe today's hearing is not in relation to my client's child, then we are going to reserve his right [to challenge the removal of baby Z.B.]."  However, notwithstanding this attempted reservation, Judge Weinstein cautioned plaintiff and his attorney as follows:

> THE COURT: Okay, you know, pursuant to Section 1028, I think that there is a hearing [at which] he is represented by counsel, and he has an opportunity to participate, that will – and the fact that the hearing goes forward today, that will preclude him from seeking this relief in the future.  Has he been advised of that?

MR. KUCUTSEY [plaintiff's attorney]: He understands now.

* * *

THE COURT: You know, I am dealing here with a hearing that involves – that is for the purpose of determining whether the removal of the children was justified by an imminent risk, and whether or not the imminent risk would continue, and whether or not there are services that could be provided that would minimize the risk so that the children could be safely returned, and I think *the issue really is inexplicably* [inextricably] *entwined regarding all five children*. So, I am – I don't – and the whole nature of this is to have emergency relief prior to a fact finding. *So, if I am going to be having a hearing, to determine all of the same issues, I – I think this is the hearing*. So, I think it is unlikely that the Court would grant another pretrial 1028 application for a hearing. . . .

Okay. Mr. Kucutsey, I understand your client says he is not with – he is not going to be participating. You and he have the right to remain, and to – and to be provided with the evidence. I also understand your primary today[sic] and I am not going to –

MR. KUCUTSEY: (Interposing) I'm not going to remain. I would like to – I would like to request – will request the transcripts of the hearing.

THE COURT: Okay. You can certainly put in a request for those and – and you will be provided with –

MR. GWINN [ACS's attorney]: (Interposing) I can certainly provide him with discovery –

THE COURT: Fine. And – all right. Mr. Thomas, you have the right to remain as well, and to hear all the evidence. You have the right to participate in the hearing, at any time, to address the issue of custody of your child.

(emphasis added.) Carrying this point forward, just before the Court began to receive testimony, plaintiff's lawyer inquired, "Your Honor, I would like to excuse myself," to which Judge Weinstein responded, "Oh, fine. Good bye. Thank you." The transcript does not disclose whether plaintiff left with his attorney or remained for the hearing.

Second, before his attorney left, plaintiff took the position at the November 30th hearing that he did not live at the Apartment. This was a position reiterated several times not only by plaintiff's attorney, but also by the children's mother:

THE COURT: Does Mr. Thomas reside in the home with [the mother] and the children? Or was he, until the removal of the children?

MR. KUCUTSEY [plaintiff's attorney]: No, he was not.

THE COURT: Because, according to the petition, both parents – or both parties were named as residing at [the Apartment].

MR. GWINN [ACS's attorney]: I have an affidavit of service that indicates that an individual known as Monte Thomas was, in fact, served with summons and petitions on November the 19th at that exact address.

MR. KUCUTSEY: Well, Your Honor, he has the full month of –. The child is four months old. So, it would make sense that – at that residence. Your Honor, in fact his – his grandmother lives down the block from his residence. He comes there, you know – so there would be a reason that he would be at the house – but he does not live there.

MS. BASKIN [the mother's attorney]: And my client also says that Mr. Thomas does not reside there, but he is there.

Thus, both plaintiff's attorney and the mother's attorney represented to the Court that plaintiff did not live at the Apartment, and plaintiff, who was present and under oath, said nothing to correct them.[6]

Third, the November 30th hearing is significant because the Court received extensive testimony from defendant Cort, the caseworker, as to her involvement in the case. She testified that prior to visiting the Apartment, she reviewed the file and saw a prior complaint for excessive corporal punishment on J.B., the oldest child, against both plaintiff and the mother. She then had a conversation with the guidance counselor, defendant Gina Digglio. Digglio reported that she and the children's two teachers had observed "bad body and breath odor" coming from the children; that they had been late 35 times between them, each time for at least an hour; and that

---

[6] It is not a material point, but it does not seem too speculative to suggest that what may have been going on here was that if plaintiff had a criminal conviction, it may have raised a question as to whether he could legally reside in the public housing that the mother and children lived in during the period in question. See http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (noting Class C felon named "Dermont Thomas" released from parole supervision 10/31/2003); https://www.reentry.net/ny/help/item.2912-Housing_and_Reentry (noting that a Class C felon is not allowed to live in NYCHA housing until six years after release from parole supervision).

they frequently complained of being hungry and were given breakfast by their teachers before going to class.  Digglio further reported that she had a parent-teacher meeting with the mother three days prior to filing the report with ACS, but the mother could give no reason why the children were so frequently late, especially since they lived across the street from the school. Digglio offered to pick up the children and bring them to school but the mother demurred. Digglio said that as a result of the lateness, the children, one of whom was in a special education class, were at risk of not being promoted.

Based on that conversation, Cort visited the Apartment on November 12, 2010.  Present were the mother; her brother, Randy Benson; plaintiff; another unidentified adult; and the five subject children.  Cort testified to observing deplorable conditions relating primarily to sanitation, odors, insect infestation, lack of food, lack of lighting, unwashed condition of the younger children, and inadequate sleeping accommodations, although some of those conditions had somewhat improved on a second visit after the children had been removed.  Photographs were admitted into evidence, documenting her observations.  She also related a conversation with J.B., the oldest child, who told her that plaintiff and Randy Benson frequently smoked marijuana in the Apartment and that the mother and plaintiff would hit her with a hangar when she got into trouble.

A particular focus of Cort's testimony was the condition of baby Z.B. – the only child that plaintiff claimed was his.  The attorney for the mother repeatedly objected to this testimony on the ground that only custody of the older four children was at issue, but Judge Weinstein, consistent with his warning to plaintiff and his attorney before the hearing, overruled the objections on the ground that evidence of neglect towards baby Z.B. could tend to show

derivative neglect towards the other children.  Cort testified that the baby was smaller than a three month old should be, her eyes appeared sunken in her head, and she was very pale.

The mother acknowledged to Cort during her visit that the baby had been diagnosed at Woodhull Hospital with "failure to thrive,"[7] and that a nurse was supposed to be visiting the baby at home, but the nurse never came.  The mother advised Cort that the baby's birthweight was 6 lbs. 8 ounces, but at three months old upon admission to Woodhull Hospital, the baby was only 6 lbs. 13 oz.  She was discharged five days later at 7 lbs. 13 oz.  Upon removal by ACS on November 12, she weighed only 8 lbs. 3 oz.  Cort further testified that she called the child's pediatrician, who confirmed that the baby had been diagnosed with failure to thrive.  The pediatrician told Cort that nurses had tried to reach the mother to bring the baby in for follow up, but these efforts were unsuccessful.

Cort also testified that she had offered parenting services to the mother, who had agreed to use them but had not.  In addition, based on her conversation with J.B. about marijuana use in the Apartment, Cort asked the mother and the mother's brother, Randy Benson, to submit to drug testing.  The mother agreed and tested negative; Randy Benson declined to be tested.  Cort had also wanted to ask plaintiff to submit to drug testing, but he left the Apartment before she had the chance.

The November 30th § 1028 hearing was continued to December 10, 2010.  Plaintiff and his attorney did not appear at the reconvened hearing, but the mother and her attorney did.  At the hearing, the parties stipulated that the deficiency in sleeping arrangements had been cured.

---

[7] "Failure to thrive is defined as decelerated or arrested physical growth (height and weight measurements fall below the third or fifth percentile, or a downward change in growth across two major growth percentiles) and is associated with abnormal growth and development. The reason for failure to thrive is inadequate nutrition." John Hopkins Medicine, Health Library, "Failure to Thrive," at http://www.hopkinsmedicine.org/healthlibrary/conditions/pediatrics/failure_to_thrive_90,P02297/ (last visited December 20, 2016).

The mother's attorney also advised Judge Weinstein that the mother had amended the petition so as to seek return of only the oldest three children, instead of the oldest four, thus agreeing that the youngest two children could remain in ACS custody.

Judge Weinstein then received testimony from the children's mother. The mother testified that she lived alone with the five children. When asked if anyone besides her and the children had ever lived at the apartment, she identified her brother Randy Benson – not plaintiff, who she testified lived elsewhere. She testified that when the children missed breakfast, it was because they did not want to eat, and when they were late for school, it was because one of them was sick. She said that plaintiff made the children dinner, but identified him as the father only to baby Z.B. She denied that she had any conversations with the children's guidance counselor.

Judge Weinstein then ruled from the bench. He found Cort's testimony fully credible, and the mother's testimony largely incredible. Nevertheless, he found that appropriate conditions could be put into place to protect the three older children, and therefore ordered, *inter alia*: (1) twice weekly home visits with private conferences between the caseworker and the children; (2) an order of protection, excluding the mother's brother, Randy Benson, from the home as a result of his refusal to submit to drug testing; and (3) a prohibition on corporal punishment of any kind.

In addition, ACS requested that Judge Weinstein order plaintiff excluded from the Apartment based on hospital records received in evidence in which the children had reported that he was using marijuana in the house along with Randy Benson.[8] The mother's attorney then inquired, "[e]xcluded so he can't visit, or excluded so he can't reside there[, be]cause he doesn't reside there." ACS's attorney answered, "reside." The mother's attorney then confirmed that

---

[8] The inference that marijuana or drugs were being used was based on the children's statements to hospital personnel that Randy Benson and plaintiff were smoking something that "made a lot of fire."

her client would ensure that no one smoked marijuana in the house.  On that basis, Judge Weinstein declined to exclude plaintiff from the Apartment.

The status quo was not long maintained.  Five days later, on December 15, 2010, a hearing was held in front of Family Court Judge Danoff on a petition by ACS for an order to show cause as to why the children should not be remanded to ACS for violations of the conditions set by Judge Weinstein.  In an affidavit, attached to ACS's order to show cause, defendant Cort averred that: (1) on December 14, 2010 she visited the apartment and found the three children alone with Randy Benson, and plaintiff did not return to the apartment until a half hour later; (2) the children advised her that Randy Benson had spent the night in the apartment; (3) she had observed that the children were wearing the same clothing that they had been wearing the previous day; and (4) one of the children informed her that she had not had a bath in four days.

Both plaintiff and the mother were present through counsel at the December 15th hearing.  At the hearing, the mother consented to the remand and Judge Danoff ruled that "the order to show cause is granted on consent."  Judge Danoff then ordered the children remanded to the custody of ACS, finding that "it is contrary to the welfare of the children to remain with the mother and the father at this time."  Significantly, plaintiff did not object to ACS's petition for remand on the mother's consent.  The children were then removed pursuant to Judge Danoff's order.

The next Family Court record we have is from a conference held before Family Court Judge Beckoff almost a year later, on November 17, 2011.  At the time of the hearing, all of the children remained in foster care.  The November 17th conference is significant because, despite plaintiff's and the mothers' previous assertions to Judge Weinstein that plaintiff was only the

father of baby Z.B., and was not the father of the four other children, plaintiff and the mother sought the entry of an order of filiation establishing plaintiff's paternity over all five children. After plaintiff and the mother affirmed under oath that plaintiff was the biological father of all five children, Judge Beckoff entered five orders of filiation, declaring that plaintiff was the father of each child.

On December 12, 2011, plaintiff and the mother had another baby, infant J.B. Three days after her birth, before she had been released from the hospital, ACS filed a petition for the removal of the child. A hearing was held the same day, December 15, 2011, in front of Family Court Judge Turbow. Plaintiff and the mother, who were both present and represented by separate counsel, objected to the removal. ACS's attorney informed Judge Turbow that ACS was seeking remand of infant J.B. because

> it would be contrary to the welfare of this newborn to be released to the care of the respondents [plaintiff and the mother] and that reasonable efforts to prevent the removal of this baby have been made in that the five siblings have been in foster care since 2010, various referrals having been made . . . to promote reunification, and assist with the underlying issues which led to the filing of the removal. . . . [Due to] the outstanding issues related to child neglect . . . [ACS] believes that a remand is in order.

In response to a question by Judge Turbow as to, "whether the father is capable of taking care of the children," the attorney for ACS stated that, "It's my understanding that although the mother has tried complying or has complied with some of her service plan, the father has not complied with any aspect of his service plan, and so . . . [ACS] believes that he is not an appropriate resource." Based on this information, Judge Turbow ordered infant J.B. remanded to ACS, finding that a "return home [would be] contrary to [infant J.B.'s] best interests in view of allegations in [the] petition and prior history" and that "reasonable efforts" had been made by ACS in light of the services provided "with respect to [the] other children."

A § 1028 hearing was held five days later in front of Judge Beckoff, on December 20, 2011. The mother and plaintiff were both present and represented by separate counsel. We do not have the complete record of the December 20th hearing, but the portion we have is sufficient for our purposes.

At the hearing, the Court heard testimony from Sharon DaSilva, the ACS caseworker assigned to infant J.B.'s case. DaSilva testified that on December 14, 2011, she received an oral report from a foster care agency, which was monitoring the mother and plaintiff because their other children were in foster care, reporting that the mother had delivered a new baby and that no preparations had been made for the new baby. After receiving the report, DaSilva went to the hospital to visit the mother. DaSilva testified that when she had asked the mother why she was not prepared for the baby, "she told me that her due date was on the 15th . . . and she just didn't make any preparation[s]." DaSilva further testified that when she asked the mother if she was planning to breast feed the baby, "she said no . . . she told me that she . . . was smoking cigarettes all through the pregnancy and she feel[sic] that the nicotine in the breast milk might harm the baby."

Based on this conversation, DaSilva asked the mother if she could visit the apartment. The mother agreed and went with DaSilva to the apartment later that day, December 14, 2011. DaSilva testified that the floors of the apartment were dirty, there was no working stove, and the bedrooms looked like a "junk yard" because there were boxes, television sets, and tool kits scattered all over the room. DaSilva also stated that she did not observe any baby clothes or formula.

After making these observations, DaSilva told the mother that she did not think that she was prepared or ready for the baby, and the mother agreed. DaSilva testified that at the child

safety conference the following day, plaintiff had also acknowledged that the children's bedrooms were not prepared and blamed the condition of the bedrooms on a bedbug infestation, the same explanation the mother had given the previous year when ACS initially visited the apartment in 2010.

As they got older, all of the children were ultimately returned from foster care to the mother and plaintiff, beginning in 2012 and continuing through 2013. These return orders were subject to a number of stringent conditions. The Family Court case was closed in 2014, and plaintiff brought this action the following year.

## DISCUSSION

It is understandable that, as a *pro se* litigant attacking a series of events in state court proceedings that happened years ago, plaintiff's theory of the case as expressed in his amended complaint is not only imprecise, but has evolved as defendants have refuted various of his contentions with documentary evidence. Liberally read, the essence of the claim against each defendant is as follows.

As to Gina Digglio, the school guidance counselor, she did not follow a number of New York City Board of Education policies and procedures requiring parental consultation and support before the guidance counselor can file a report with ACS. The failure to observe these guidelines, according to plaintiff, deprived him of his right to due process of law.

As to the ACS caseworkers, Chiou, Cort, and Grant, and the two police officers, they violated plaintiff's due process rights in the following ways: (a) obtaining medical information without consent under HIPAA; (b) removing the children from the Apartment without a court order and without consent; (c) failing to serve plaintiff with the Order of Protection barring

Randy Benson from the Apartment, and then removing the children again when it was violated; and (d) removing the newborn child from the hospital shortly after her birth in December 2011. In addition, plaintiff claims that Cort, Grant, and the police officers violated his and the children's Fourth Amendment rights when they entered the Apartment.

In opposing defendants' motion for summary judgment, plaintiff additionally offers that defendants presented "false and misleading" testimony to the Family Court to obtain the removal. He also asserts that the fact that the Family Court ultimately returned the children to the mother and plaintiff proves that their removal was improper *ab initio*.

My conclusions as to these claims, based on the record, are as follows.

First, there is no plausible claim against Chiou. All that is alleged is that she received the report from Digglio and passed it on to Cort and Grant. There is nothing unconstitutional about that; that is her job. Defendants' motion for summary judgment is granted as to her.

Second, there can be no claim for violation of baby Z.B.'s rights under HIPAA. The consent form that the mother signed contained an express waiver of those rights including authorization for the caseworkers to contact the child's physicians and obtain her medical files.

Third, plaintiff cannot challenge the initial removal of the children on November 12, 2010. The record shows that although plaintiff was present when ACS initially arrived at the apartment on the night of November 12, 2010, he chose to absent himself. Perhaps that is the reason he was unaware that the children's mother had consented to their removal and had received notice of the hearing to confirm the removal until defendants produced the consent form when this Court converted their motion to dismiss to a motion for summary judgment. It is axiomatic that the mother's consent to the removal of the children vitiates any due process or Fourth Amendment claims that plaintiff might have arising from that evening, as any rights she

had could obviously be waived. <u>See generally</u> <u>United States v. Smith</u>, 308 F.2d 657, 663 (2d Cir. 1962) (When a person "consents to a search or seizure . . . the protection he would have enjoyed under the Fourth Amendment is lost to him."); <u>Kreuter v. Reuter</u>, No. 01-cv-5229, 2002 WL 31946715, at *5 (E.D.N.Y. Dec. 5, 2002) ("The Supreme Court has consistently held that constitutional rights may be waived under certain circumstances.") (collecting cases).

Additionally, several of the positions that plaintiff is taking in this action to challenge the initial removal are barred by the doctrine of judicial estoppel. The doctrine of judicial estoppel bars a party from asserting a position in a later litigation that is inconsistent with his position in an earlier litigation. <u>See</u> <u>Mitchell v. Washingtonville Cent. Sch. Dist.</u>, 190 F.3d 1, 6 (2d Cir. 1999). The Supreme Court set out non-exclusive considerations for applying the doctrine in <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750–51, 121 S. Ct. 1808, 1815 (2001):

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

(citations omitted). The purpose of judicial estoppel is to "preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions" and to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." <u>Bates v. Long Island R.R. Co.</u>, 997 F.2d 1028, 1037 (2d Cir. 1993). Moreover, "[b]ecause the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion.'" <u>New Hampshire</u>, 532 U.S. at 750, 121 S. Ct. at 1815 (citations omitted).

At the November 30, 2010 evidentiary hearing before Family Court Judge Weinstein, plaintiff was placed under oath and, through his attorney's proffer, represented to Judge Weinstein that: (1) none of the children that were the subject of that proceeding – the four oldest children – were his, a point confirmed by the mother's attorney; (2) he did not live at the Apartment, another point that his attorney and the mother made repeatedly; and (3) he had no interest in remaining at the evidentiary hearing despite Judge Weinstein's warning that his findings would impact any future determination as to baby Z.B., the one child as to whom plaintiff claimed paternity. At the conclusion of the continued hearing on December 10, 2010, which plaintiff did not even attend, Judge Weinstein credited caseworker Cort's description of the deplorable conditions in the apartment on the night of the removal over the mother's denial of such conditions.

Plaintiff seeks to challenge that finding now, but he is estopped from doing so. He led Judge Weinstein to believe that the Apartment was not his residence, these were not his children, and he had no interest in the conclusions that Judge Weinstein might make. Plaintiff could have instead claimed custody of both the children and the Apartment, and even without asserting such a proprietary claim to either, participated in the hearing, as Judge Weinstein suggested, by testifying as a witness to the conditions that he observed on the night of the removal. He affirmatively chose to do neither, and thereby either misled Judge Weinstein or is attempting to mislead this Court. The doctrine of judicial estoppel compels him to adhere to the first position he took, and does not permit him to adopt a later, contrary position.

The fact that plaintiff later claimed paternity of all five children does not permit him to now challenge the removal of the children during a period when he denied being their father. Plaintiff affirmatively disavowed his rights to the care and custody of the four oldest children at

the November 30, 2010 hearing; he may not now claim that his rights were violated before he decided to begin exercising them.

Plaintiff is also estopped from claiming that he lived in the Apartment at the time of the initial removal. Additionally, the fact that plaintiff chose to leave the Apartment during the course of ACS's visit vitiates any argument that he was an overnight guest. Consequently, any claim that his Fourth Amendment rights were violated when the caseworkers and police officers entered the Apartment on the night of the initial removal must fail. See Rakas v. Illinois, 439 U.S. 128, 134, 99 S. Ct. 421, 435 (1978) (holding that a "person who is aggrieved by an illegal search . . . only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."); see also Minnesota v. Carter, 525 U.S. 83, 90, 119 S. Ct. 469, 473 (1998) ("[O]ne who is merely present with the consent of the householder" may not "claim the protection of the Fourth Amendment" as to the search of the house).

Fourth, any challenge to the subsequent removal of the three oldest children (it will be recalled that the mother elected not to contest the removal of the youngest two children) on December 15, 2010, for violations of the conditions of return, also fails. As an initial matter, plaintiff is judicially estopped from challenging the subsequent removal of the three oldest children. Prior to the children's removal, a hearing had been held in front of Judge Danoff on December 15, 2010, during which the mother gave her consent to the removal. Plaintiff, who was present at the hearing through counsel, did not contest ACS's request for remand nor object to the mother's grant of consent. In fact, plaintiff's attorney did not say anything in response to

ACS's request for removal. Plaintiff's silence at the hearing operates as consent. He may not

adopt a contrary position now and challenge the removal over four years later.[9]

Even more significantly, unlike the initial removal, the December 15, 2010 removal

occurred only after a Court order was entered permitting removal for good cause. See N.Y. Fam.

Ct. Act § 1029(a). Thus, "the independent judicial determination of the Family Court [to remove

the child] absolves Defendants of any liability." Licorish-Davis v. Mitchell, 12-CV-601, 2013

WL 2217491, *28 (S.D.N.Y. May 20, 2013).

Fifth, plaintiff has no valid claims regarding the removal of infant J.B. within days of her

birth. Like the subsequent remand of the three oldest children on December 15, 2011, infant J.B.

was removed after a Court order was entered permitting her removal for good cause. As is often

the case in Family Court proceedings, good cause for the removal of infant J.B. was found on the

basis of derivative neglect as a result of the findings from the November 30, 2010 hearing, which

plaintiff and his lawyer decided to leave, and the December 10, 2010 hearing, which plaintiff

decided not to attend. Thus, once plaintiff decided not to participate in or challenge the findings

of Family Court Judge Weinstein, he took on a heavy burden to demonstrate that the children

should not remain in ACS custody until the conditions leading to their removal had been

remedied.

The doctrine of derivative neglect is based on the common-sense notion that if the Family

Court, after a hearing, finds that children in the household are at imminent risk, then other

children introduced into the household are going to be exposed to at least the same degree, and in

the case of infant children very likely an even greater degree, of risk. See N.Y. Fam. Ct. Act §

---

[9] Plaintiff argues that the subsequent removal of the children for violations of the conditions of return was impermissible because he had not been served with Judge Weinstein's December 10, 2010 Order and had been unaware of any such conditions. However, regardless of whether plaintiff was served with Judge Weinstein's December 10, 2010 order, he was present at the December 15, 2010 hearing and he did not contest that the conditions in Judge Weinstein's order had been violated or object to the remand of the children.

1046(a)(i) ("proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the legal responsibility of, the respondent. . . ."). Numerous New York cases hold that when the conditions that had supported remanding one child to ACS have not been cured, those same conditions support remanding the other children in the household even without direct evidence that the other children suffered the same neglect. See, e.g., In re Sha-Naya M.S.C., 130 A.D.3d 719, 13 N.Y.S.3d 502 (2d Dep't 2015); In re Keyarei M., 71 A.D.3d 1510, 897 N.Y.S.2d 572 (4th Dep't 2010); In re Camara R, 263 A.D.2d 710, 693 N.Y.S.2d 681 (3rd Dep't 1999); In re Kimberly H., 242 A.D.2d 35, 673 N.Y.S.2d 96 (1st Dep't 1988). In finding derivative neglect as to infant J.B., the Family Court relied on the testimony of caseworker DaSilva, who confirmed that the conditions that led to the other children's removal had not been remedied and that the mother and plaintiff acknowledged that they were not prepared to take home an infant.

Sixth, to the extent plaintiff alleges Fourth Amendment claims in regards to the multiple removals of the children, they fail. Because Fourth Amendment rights are personal rights that cannot be asserted vicariously, see Alderman v. United States, 394 U.S. 165, 89 S. Ct. 961 (1969), plaintiff has no claim that his Fourth Amendment right to be free from unreasonable seizures was violated each time the children were removed. See Southerland v. City of New York, 680 F.3d 127, 143 (2d Cir. 2011) ("A Fourth Amendment child-seizure claim belongs only to the child, not to the parent. . . ."); Graham v. City of New York, 869 F. Supp. 2d 337, 355 (E.D.N.Y. 2012) ("[P]arents do not have their own Fourth Amendment right to be free from a child's court-approved removal.").

Any remaining claims that plaintiff may be advancing are defeated by the doctrine of qualified immunity, which protects all of the individual defendants, from the school guidance

counselor to the caseworkers to the police officers. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). The relevant question is whether it was clear to the defendant "'that his conduct was unlawful in the situation he confronted.'" Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003) (quoting Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001)). Qualified immunity applies if a government officer's "action was 'objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.'" Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (quoting X–Men Sec., Inc. v. Pataki, 196 F.3d 56, 66 (2d Cir. 1999)). In other words, "if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context," a defendant is entitled to qualified immunity. Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)).

As to Digglio, the guidance counselor, plaintiff's main point is that, pursuant to various Department of Education and school regulations and policies, she should have alerted the family to the problems before she alerted ACS. The regulations to which plaintiff cites have nothing to do with cases of child neglect. Rather, school officials' obligations in such cases are set forth in New York Social Services Law § 413, which provides that a "school official, which includes but is not limited to school teacher [and, *inter alia*,] school guidance counselor," is "required to report [to ACS] . . . when they have reasonable cause to suspect that a child . . . is an abused or maltreated child. . . ." In addition, Digglio's report was not the causative factor in the removal of

the children on November 12, 2010 – it was the observations of Cort and Grant, the conversations Cort had with the children's doctor, and, even more fundamentally, the mother's consent to the removal of the children.  At the very least, it is clear that Digglio acted in good faith.

As to the caseworkers, Cort and Grant, the mother's consent protects them from any liability for the November 12th removal.  But even beyond that, once the Family Court confirmed "'the basis for removal'" four days later, "any liability for the continuation of the allegedly wrongful separation of the parent and child can no longer be attributed to" them. Southerland, 680 F.3d at 153 (2d Cir. 2011) (quoting Nicholson v. Scoppetta, 344 F.3d 154, 172 (2d. Cir. 2003)).  Every other remand was sanctioned by Family Court Order.

Plaintiff acknowledges that he would have to show that Cort and Grant knowingly supplied false evidence to the Family Court to avoid their qualified immunity, see Wilkinson ex rel. Wilkinson v. Russel, 182 F.3d 89, 104 (2d Cir. 1999) ("Case workers cannot be free to substantiate a claim of abuse, for instance, by ignoring overwhelming exculpatory information or by manufacturing false evidence."), but what plaintiff repeatedly calls "false and misleading statements" refers only to the fact that he disagrees with the caseworkers' observations.  The most he can do is argue with their interpretation of the evidence.  For example, he points out that the reason baby Z.B. was diagnosed with failure to thrive was because she was lactose intolerant, not that he and the mother were negligently failing to feed the baby (I am not sure I see the difference; there are ways to feed a lactose intolerant child so that she does not weight 8 lbs. when she is three months old).

Those kinds of competing explanations are meant to be raised on cross-examination, which plaintiff did not do because he chose not to participate in the hearing; they are not

"fraudulent evidence" sufficient to overcome qualified immunity. The Family Court had the medical records and made its determination based on the proceedings before it. The fact that plaintiff disagrees with the Family Court's findings does not mean that they were based on fraudulent evidence.

At most, plaintiff is arguing that the caseworkers should have done a more thorough investigation, but that is a simple negligence claim, not the kind of willful or reckless indifference that overcomes qualified immunity. Indeed, plaintiff is in a particularly poor position to argue that the caseworkers should have done more because of his decision, while represented by counsel, to voluntarily abandon the removal proceedings at an early stage. Family Court Judge Weinstein expressly warned him of the potential consequences of that decision, and they did indeed come to pass. Plaintiff's failure to offer anything suggesting that "false" evidence was submitted to the Family Court shows that qualified immunity applies.

Finally, there is no plausible basis for a claim against the John Doe police officers, who assisted in the November 12th removal. As noted several times previously, the initial removal was completed with the mother's consent and was confirmed by the Family Court within four days.

**CONCLUSION**

Defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing the complaint. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that

any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      December 19, 2016